UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JENNIFER ANN FOX, | ) | Case No. 5:19CV1301 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE DONALD NUGENT |
| v. | ) | MAGISTRATE JUDGE DAVID A. RUIZ |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | REPORT AND RECOMMENDATION |

Plaintiff Jennifer Ann Fox (Fox or claimant) challenges the final decision of Defendant Commissioner of Social Security (Commissioner) denying her applications for a period of disability (POD) and disability insurance benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423, *et seq*. (Act).  This court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be affirmed.

## I.  PROCEDURAL HISTORY

On September 12, 2012, Fox protectively filed an application for a POD and DIB, alleging disability beginning June 29, 2012.  (R. 10, Transcript (Tr.), at 12, 150-151, 168-169, 181-192).  The application was denied initially and upon reconsideration, and Fox requested a hearing before an administrative law judge (ALJ).  *Id.* at 12, 65-81, 82-95, 96-99, 107-108.  Fox participated in the hearing on November 21, 2014, was represented by counsel, and testified.  *Id.*

at 29-68.  A vocational expert ("VE") also attended the hearing and provided testimony.  *Id.* at

31, 62-66.  On December 18, 2014, the ALJ issued the first decision and Fox was found   not

disabled.  (R. 10, tr., at 12-23; *see generally* 20 C.F.R. § 404.1520(a)).  The Appeals Council

denied Fox's request for review, and then ALJ's decision became the Commissioner's final

decision.  *Id.* at 1-3.  Fox filed a complaint in district court challenging the decision (*Fox v.

Colvin*, No. 5:16CV1606 (N.D. Ohio)), and the case was remanded by joint stipulation of the

parties.  (R. 10, tr., at 836).  The Appeals Council then issued a remand order, finding that the

first decision did not comply with the fibromyalgia guidelines in Social Security Ruling (SSR)

12-2p, and directing the ALJ to further evaluate claimant's impairment pursuant to SSR 12-2p.

*Id.* at 901-902.

A different ALJ held the second hearing on March 9, 2018.  (R. 10, tr., at 737-790).  Fox

participated in the hearing, was represented by counsel, and testified.  *Id.* at 739, 746-775.  A

new vocational expert attended the hearing and provided testimony.  *Id.* at 739, 777-788.  On

May 10, 2018, the ALJ issued the second decision, concluding that Fox was not disabled.  *Id.* at

692-705.  The Appeals Council denied Fox's request for review, thus rendering the second ALJ

decision the Commissioner's final decision.  *Id.* at 682-684.  Fox filed a second complaint in

district court challenging the Commissioner's final decision, pursuant to 42 U.S.C. § 405(g).

The parties have completed briefing in this case.  Fox argues the ALJ erred when analyzing her

pain and fibromyalgia, rejecting a functional capacity evaluation, and posing a hypothetical

question to the VE that did not reflect plaintiff's residual functional capacity.  (R. 12, PageID #:

1317, 1326).

2

## II.  PERSONAL BACKGROUND INFORMATION

Fox was born in 1976, and was 41 years old, which is defined as a younger individual age 18-49, on the date last insured.  (R. 10, tr., at 21, 34, 150, 703).  She has a high school education and is able to communicate in English.  *Id.* at 21, 34, 181, 183.  Fox has past work as a customer order clerk, customer service supervisor, and a home health aide.  *Id.* at 779.

## III.  RELEVANT MEDICAL EVIDENCE[1]

Disputed issues will be discussed as they arise in Fox's brief alleging error by the ALJ. On February 8, 2012, Fox saw Mark J. Pellegrino, M.D., of Ohio Pain & Rehab Specialists, for a six-month followup appointment, describing recurring pain, chills, sweats, weight gain, and difficulty sleeping.  (R. 10, tr., at 297-98).  She had balance difficulties, headache, memory loss, speech difficulty and local weakness.  *Id.* at 298.  Fox also described muscle pain, stiffness, and cramps, but denied any global weakness or myalgia, joint pain, neck pain or back pain.  *Id.* at 299.  On physical examination, the doctor noted that Fox appeared in no acute distress, but palpitation revealed numerous painful stress areas throughout.  *Id.*  Sensation, strength, and coordination were normal, there was no joint swelling or effusion, and her spinal and extremity ranges of motion were normal.  *Id.*  Dr. Pellegrino diagnosed Fibromyalgia Syndrome, and treated her with an injection of IM Ketorolac.  *Id.*  The doctor also advised her to continue with massotherapy for medical reasons, which had been helpful in the past.  *Id.* at 297, 299.

---

[1]  The summary of relevant medical evidence is not intended to be exhaustive.  It includes only those portions of the record cited by the parties and also deemed relevant by the court to the assignments of error raised.

Fox returned to Dr. Pellegrino on May 31, 2012, complaining of increased frequency of migraines (four times a week) which were not alleviated by her medications.  (R. 10, tr., at 278). She reported that widespread body pain and headaches interfered with her ability to concentrate and focus at work.  *Id.*  She also described pain, stiffness, and cramps, but denied any global weakness or myalgia, joint pain or swelling, neck pain or back pain.  *Id.* at 280.  On physical examination, Dr. Pellegrino noted that the claimant appeared in no acute distress, but palpitation revealed numerous painful areas throughout, with localized spasms.  *Id.*  Sensation, strength, coordination and cranial nerves were normal, there was no joint swelling or effusion, and her spinal and extremity ranges of motion were normal.  *Id.*  The doctor adjusted her medications, adding Inderal and Imitrex for her migraines instead of Floricet.  *Id.* at 281.

Fox applied for DIB benefits on September 12, 2012, alleging disability beginning June 29, 2012.  (R. 10, tr., at 12, 150-151).  She listed the physical or mental conditions that limit her ability to work as: "Fibromyalgia, migraine headaches, chronic fatigue, irritable bowel syndrome, chronic back and neck pain, brain fog/ short term memory issues."  *Id.* at 182.

On December 18, 2012, state agency medical consultant Edmond Gardner, M.D., completed a physical residual functional capacity (RFC) assessment of Fox.  (R. 10, tr., at 76-78).  Dr. Gardner assessed that Fox can lift or carry up to 10 pounds frequently, and 20 pounds occasionally, with the ability to stand or walk for a total of six hours, and to sit for about six hours, of an 8-hour workday.  *Id.* at 76-77.  She can frequently climb ramps or stairs, but never climb ladders, ropes, or scaffolds.  *Id.* at 77.  She can frequently balance, stoop, or crouch, and can occasionally kneel or crawl.  *Id.*  Dr. Gardner did not assess any manipulative, visual or

communicative limitations.  *Id.*  The doctor stated that Fox should avoid all exposure to hazards, such as machinery or heights.  *Id.* at 78.

On April 26, 2013, Fox presented to Timothy L. Hagen, D.O., on referral from Lawrence Penvose, D.O., for a neurological consultation.  (R. 10, tr., at 543-545).  She reported fibromyalgia, sleep difficulties, and increased headaches.  *Id.* at 543.  Dr. Hagen determined that Fox's headaches were caused by over-medication.  *Id.*  The neurologist stated that Fox had "increased the amount of acetaminophen that she has been taking between the Norco and the Fioricet and I believe that is now causing chronic daily headache" as well as causing other issues.  *Id.*  Dr. Hagen recommended that she switch from Norco to Hydrocodone (that does not have acetaminophen), and to discontinue Fioricet.  *Id.*

Fox also reported symptoms of "diarrhea, nausea, constipation, depression, anxiety, weight gain, rash, joint pain palpitations, throat pain, insomnia, [and] daytime sleepiness."  (R. 10, tr., at 543).  On examination, Dr. Hagen noted that Fox reported significant tenderness over the occipital nerve.  *Id.* at 544.  Otherwise, her cranial nerves were normal, and there were no cranial or carotid bruits.  *Id.* at 545.  Claimant had normal motor strength and tone, normal reflexes, and normal coordination on all tests.  *Id.*  Her gait was normal, and sensory examination was also normal.  *Id.*  The neurologist adjusted her medication, added Topamax, and noted further adjustments anticipated on follow-up.  *Id.*

At a June 13, 2013, follow-up appointment with Ned Nafziger, M.D., Fox again reported fibromyalgia, migraine headaches, and bilateral occipital pain.  (R. 10, tr., at 528).  She reported that the Topamax had helped to a degree.  *Id.*  On physical examination, Fox appeared in no acute distress, had full strength and normal sensation in her arms and legs, along with functional

5

and pain free range of motion in her neck, arms, and legs.  *Id.* at 530.  Dr. Nafziger diagnosed

Fox with occipital neuralgia, and scheduled her for a series of bilateral occipital nerve blocks

along with neck and shoulder exercise instruction on follow-up.  *Id.*

On July 19, 2013, state agency medical consultant Eli Perencevich, D.O., completed a

physical RFC assessment of Fox on reconsideration.  (R. 10, tr., at 90-92).  Dr. Perencevich

adopted the identical limitations identified earlier by Dr. Gardner.  *Id.*

Fox was referred to the Aultman Center for Pain Management and had an appointment

with Jose Casanova, M.D., on July 22, 2013.  (R. 10, tr., at 488).  Dr. Hagen referred her to the

pain center "because of diffuse myofascial pain," which reportedly developed after several

automobile accidents.  *Id.*  Dr. Casanova noted that Fox had been diagnosed with fibromyalgia as

well as insomnia and migraine headaches.  *Id.*  Physical examination was normal: cranial nerves

normal, neck supple with full range of motion, motor examinations 5/5 in both arms and legs,

normal muscle tone, and normal coordination.  *Id.* at 488-489.  Dr. Casanova's impression was

"chronic myofascial pain (fibromyalgia)."  *Id.*  The doctor's plan was to maintain Fox on Norco

since she was "doing well" with that medication, and to start Zanaflex to help facilitate sleep.  *Id.*

On September 16, 2013, Fox reported to Dr. Casanova that although she continued to

have chronic myofascial pain, she had "been taking Norco for several months with good relief."

(R. 10, tr., at 486).  On physical examination, Dr. Casanova found range of motion of 5/5 in both

arms and legs, normal muscle tone, and no focal areas of atrophy.  *Id.*  Reflexes, sensory and

coordination were normal.  *Id.*  The doctor found that Fox had diffuse myalgias in both the

cervical and lumbar regions.  *Id.*  Dr. Casanova maintained claimant on the same medications

and doses, with a follow-up scheduled for two months.  *Id.* at 487.

A functional capacities evaluation (FCE) was performed on June 18, 2014, by Deborah L. King, OTR/L, CHT, of Concorde Therapy Group.  (R. 10, tr., at 547-549).  During the FCE, occupational therapist King reported that Fox was unable to lift a 10 pound load from floor to waist height, or to maneuver it at all, without "significant severe increased low back pain."  *Id.* at 547.  She was able to carry a 5 pound weight at waist level for ten feet resulting in increased pain in her left leg and lower back.  *Id.*  The provider noted Fox is able to occasionally bend, reach, climb stairs, squat, kneel, and walk.  *Id.* at 548.  She avoids climbing stairs at home.  *Id.*  She was unable to crawl, and had significant difficulty returning to an upright position from kneeling.  *Id.*  After walking slowly for ten minutes, she reported increased back and leg pain.  *Id.*  She was able to sit and stand for up to twenty minutes.  *Id.*  Overall, the therapist stated the results of the FCE indicated that Fox would be rated "well below a functional level of sedentary work."  *Id.* at 549.  She reported pain to be at a level of 7 to 8 out of 10.  *Id.*

On June 27, 2014, Fox presented to Brian L. Vereb, CNP, of the Center for Neuro and Spine, complaining of worsening back pain.  (R. 10, tr., at 609).  Fox reported that she had moderate to severe pain in her lower back, which had begun six months earlier.  *Id.*  The pain radiated from her lower back to her left thigh, calf, and foot, with numbness, tingling, and cramping.  *Id.*  Claimant also reported numbness in both hands; she was being evaluated for carpal tunnel and had an electromyography (EMG) study scheduled for July 2014.  *Id.* Along with back pain, Fox also reported joint pain, muscle weakness, and neck pain.  *Id.*

On physical examination, there was posterior tenderness to palpitation in the cervical and lumbar regions.  (R. 10, tr., at 611).  Arm and leg strength was normal bilaterally, gait was normal, cranial nerves were normal and grossly intact, and deep tendon reflexes were normal.

7

*Id.*  Nurse practitioner Vereb assessed Fox with low back pain and referred her for physical therapy evaluation and treatment.  *Id.* at 612.  John B. Butler, M.D., reviewed MRI imaging provided by Fox, and recommended an ENG of her legs for lumbar radiculitis.  *Id.*  Dr. Butler noted: "Mrs. Fox's MRI does not adequately explain her symptoms.  I am going to order an EMG/NCV to further evaluate her radicular symptoms."  *Id.* at 613.

On July 1, 2014, Ryan Drake, D.O., prepared an EMG/Nerve Conduction Study Report of the bilateral upper extremities.  (R. 10, tr., at 597).  Dr. Drake reported that the nerve conduction studies of Fox's arms were normal, and the EMG of her arm muscles was also normal.  *Id.*  The doctor reported it as a normal study with "no electrodiagnostic evidence of a bilateral median mononeuropathy at the wrist [carpal tunnel syndrome], bilateral ulnar neuropathy or bilateral cervical radiculopathy."  *Id.*

An MRI of the cervical spine conducted on November 3, 2014, showed no significant canal or neural foraminal stenosis.  (R. 10, tr., at 680-681).

On referral from Dr. Penvose, Fox presented to David A. Martin, M.D., of the Arthritis Clinic of Stark County, on November 12, 2014, for an office visit.  (R. 10, tr. at 734).  Dr. Martin discussed Fox's symptoms and medications, without documenting a physical examination.  *Id.* at 734-735 ("we had a long and detailed discussion").  The doctor noted prior diagnoses of fibromyalgia/myofascial pain; chronic fatigue syndrome; and sleep disorder.  *Id.* at 734.  Dr. Martin increased the dosage of her Zanaflex, but also recommended that Fox get involved in a cognitive behavioral therapy program.  *Id.* at 735.  He also recommended meditation and an aerobic exercise plan.  *Id.*  Follow-up was recommended in 2-3 months.  *Id.*

In addition to her medical treatment, Fox received chiropractic adjustments and manipulations from November 30, 2012, onward. *See, e.g.*, R. 10, tr., at 403-404, 615, 617, 1077, 1079.

On April 20, 2016, Fox presented to Carlos E. Zevallos, D.O. with symptoms of fatigue, migraine headaches, muscle pain and weakness, abnormal mood, paresthesias, and sleep problems. (R. 10, tr., at 731). On examination, the doctor noted decreased bilateral grip strength, tenderness in the left forearm, and left shoulder pain. *Id.* at 732. There was tenderness in the cervical, thoracic, and lumbar paraspinal muscles. *Id.* Dr. Zevallos' assessment was arthralgia, myalgia, and other fatigue. *Id.* The doctor did not find evidence for inflammatory arthritis or underlying connective tissue disease as the source of her symptoms. *Id.* Fox was to follow up with her pain management physician and endocrinologist. *Id.*

Fox returned to Dr. Casanova at the Aultman pain center on December 12, 2016. (R. 10, tr., at 1145). She rated her pain at 4-5, indicated her symptoms were unchanged, and told the doctor that her medication was still helping. *Id.* On physical examination, claimant's neck was supple with a full range of motion, motor exam was 5/5 in both arms and legs, with normal muscle tone. *Id.* There were no focal areas of atrophy, and no pronator drift. Her deep tendon reflexes, sensory and coordination were normal. *Id.* The doctor maintained her on the same medication, with a three-month follow-up. *Id.*

On March 9, 2017, Fox presented to Jennifer Wojtowicz, M.D., at Western Reserve Hospital, complaining of extreme fatigue and chronic pain. (R. 10, tr., at 1117). Fox reported to the doctor that she had a partial thyroidectomy in May 2016. *Id.* She said she felt tired all day, although she was able to do her usual activities. *Id.* at 1118. She had no neck stiffness or pain.

9

*Id.* Dr. Wojtowicz assessed nontoxic goiter, unspecified chronic fatigue, and they discussed thyroid disease. *Id.* at 1117-1118.

On April 3, 2017, Fox had a follow-up visit with Dr. Casanova. (R. 10, tr., at 1141). Although Fox reported that her pain remained unchanged, she also stated that she still had significant relief with prescribed medications. Claimant also reported that her migraines were well-controlled with Topamax. *Id.* On physical examination, Fox's neck was supple with a full range of motion. *Id.* Her deep tendon reflexes, sensory and coordination were normal. *Id.* She had diffuse myalgias in the cervical and lumbar regions. *Id.* Dr. Casanova's impression was chronic myofascial pain (fibromyalgia), "chronic migraine without aura, not intractable, non-status," and bipolar disorder. *Id.* The doctor maintained her on the same medication, with a three-month follow-up. *Id.* at 1142.

Fox saw Dr. Casanova on June 8, 2017, and reported a slight increase in pain, with a new symptom of left flank pain, and complaints of hypothyroidism. (R. 10, tr., at 1139). Otherwise, she denied any new medical problems. *Id.* On physical examination, Fox's neck was supple with a full range of motion; her deep tendon reflexes, sensory and coordination were normal. *Id.* Dr. Casanova maintained her on the same medications, with another three-month follow-up. *Id.*

## IV.  ALJ's DECISION

The ALJ made the following findings of fact and conclusions of law in the May 10, 2018, decision:

1.  The claimant last met the insured status requirements of the Social Security Act on December 31, 2017.

2.  The claimant did not engage in substantial gainful activity during the period from her alleged onset date of June 29, 2012, through her date last insured of December 31, 2017 (20 C.F.R. 404.1571 *et seq*).

3.  Through the date last insured, the claimant had the following severe impairments: fibromyalgia, myalgia, arthralgia, myofascial pain; migraine headaches, occipital neuralgia cervical syndrome; osteoarthritis; obesity (20 C.F.R. 404.1520(c)).

4.  Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, and 404.1526).

5.  After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) with certain restrictions. Specifically, the claimant can frequently climb ramps and stairs, but can never climb ladders, ropes or scaffolds.  She can frequently balance, stoop and crouch, and occasionally kneel and crawl.  She must avoid concentrated exposure to temperature extremes and avoid all exposure to hazards, such as unprotected heights.

6.  Through the date last insured, the claimant was capable of performing past relevant work as a customer order clerk and customer service supervisor.  This work did not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 C.F.R. 404.1565).

7.  The claimant was not under a disability, as defined in the Social Security Act, at any time from June 29, 2012, the alleged onset date, through December 31, 2017, the date last insured (20 C.F.R. 404.1520(g)).

(R. 10, tr., at 694, 695, 697, 698, 703, 704).

## V.  DISABILITY STANDARD

A claimant is entitled to receive DIB or SSI benefits only when she establishes disability within the meaning of the Social Security Act.  *See* 42 U.S.C. §§ 423, 1381.  A claimant is considered disabled when she cannot perform "substantial gainful employment by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve (12) months." 20 C.F.R. § 404.1505(a).

11

Social Security Administration regulations require an ALJ to follow a five-step sequential analysis in making a disability determination.  *See* 20 C.F.R. § 404.1520(a); *Heston v. Commissioner of Social Security*, 245 F.3d 528, 534 (6th Cir. 2001).  The Sixth Circuit has outlined the five steps as follows:

> First, the claimant must demonstrate that he has not engaged in substantial gainful activity during the period of disability.  20 C.F.R. § 404.1520(a)(4)(i).  Second, the claimant must show that he suffers from a severe medically determinable physical or mental impairment.  *Id.* § 404.1520(a)(4)(ii).  Third, if the claimant shows that his impairment meets or medically equals one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, he is deemed disabled.  *Id.* § 404.1520(a)(4)(iii).  Fourth, the ALJ determines whether, based on the claimant's residual functional capacity, the claimant can perform his past relevant work, in which case the claimant is not disabled.  *Id.* § 404.1520(a)(4)(iv).  Fifth, the ALJ determines whether, based on the claimant's residual functional capacity, as well as his age, education, and work experience, the claimant can make an adjustment to other work, in which case the claimant is not disabled.  *Id.* § 404.1520(a)(4)(v).

> The claimant bears the burden of proof during the first four steps, but the burden shifts to the Commissioner at step five.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

*Wilson v. Commissioner of Social Security*, 378 F.3d 541, 548 (6th Cir. 2004).

## VI.  STANDARD OF REVIEW

Judicial review of the Commissioner's benefits decision is limited to a determination of whether the ALJ applied the correct legal standards and whether substantial evidence supports the ALJ's findings.  *Blakley v. Commissioner of Social Security*, 581 F.3d 399, 405 (6th Cir. 2009)*; Richardson v. Perales*, 402 U.S. 389, 401 (1971).  "Substantial evidence" has been defined as more than a scintilla of evidence, but less than a preponderance of the evidence.  *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003); *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981).  Thus, if the record evidence is of such a nature that a

12

reasonable mind might accept it as adequate support for the Commissioner's final benefits determination, then that determination must be affirmed. *Wright*, 321 F.3d at 614; *Kirk*, 667 F.2d at 535.

The Commissioner's determination must stand if supported by substantial evidence, regardless of whether this court would resolve the issues of fact in dispute differently, or substantial evidence also supports the opposite conclusion. *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986). This court may not try the case *de novo*, resolve conflicts in the evidence, or decide questions of credibility. *Wright*, 321 F.3d at 614; *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). The court, however, may examine all the evidence in the record, regardless of whether such evidence was cited in the Commissioner's final decision. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989); *Hubbard v. Commissioner*, No. 11-11140, 2012 WL 883612, at *5 (E.D. Mich. Feb. 27, 2012) (quoting *Heston*, 245 F.3d at 535).

## VII.  ANALYSIS

Fox presents the following legal issues for the court's review:

Whether the administrative law judge's decision is supported by substantial evidence [1] when she does not properly analyze plaintiff's pain and fibromyalgia as contemplated by the Social Security Rulings; [2] when she improperly rejects the results of a functional capacity evaluation; and [3] when she adopts a hypothetical question that is not reflective of plaintiff's RFC.

(R. 12, PageID #: 1317, 1326).

## A.  Fibromyalgia

In the first assignment of error, Plaintiff asserts the ALJ's determination as to the credibility of Plaintiff's pain symptoms is flawed. (R. 12, PageID# 1327-1333). Specifically, Plaintiff

13

points out that the ALJ accepted that she suffered from fibromyalgia, as it was included among Plaintiff's severe impairments.  (Tr. 695).  Social Security Ruling (SSR) 12-2p, sets forth the Social Security Administration's directions for evaluating fibromyalgia.  SSR 12-2p; 2012 WL 3104869 (July 25, 2012).[2]  The ALJ, despite not specifically citing any evidence of record, determined that all three prongs were satisfied, noting "there is a history of widespread pain, there are 11 positive tender points on examination, and there is evidence other disorders were excluded."  (Tr. 695).  As the court understands Plaintiff's argument, she agrees with the ALJ's observation that "it is not uncommon to find a lack of objective etiology for the reported pain and symptoms associated with fibromyalgia" but takes issue with the ALJ detracting from her credibility due to the lack of objective or corroborating evidence. (R. 12, PageID# 1329-1332; tr. 701).  Conversely, the Commissioner argues that the ALJ properly evaluated Plaintiff's symptoms, including those allegedly stemming from fibromyalgia. (R. 14, PageID# 1349-1351).

As noted above, in the case at bar, the ALJ specifically found that claimant suffered from fibromyalgia, and designated it as a "severe" impairment.  (Tr. 695).  A finding that fibromyalgia constitutes a severe impairment, however, does not equate to a finding of disability, nor does a

---

[2] SSR 12-2p describes criteria for evaluating whether a person has a medically determinable impairment of fibromyalgia.  *Luukkonen v. Commissioner*, No. 15-1561, 2016 WL 3426370, at *4-*5 (6th Cir. June 22, 2016).  Under SSR 12-2p, a person has fibromyalgia if: (1) there is a history of widespread pain, in all quadrants of the body, that has persisted for at least 3 months (the pain may fluctuate in intensity and may not always be present); (2) at least 11 of 18 possible positive tender points are found on physical examination; and (3) there is evidence that other disorders were excluded as possible causes of the pain.  SSR 12-2p, 2012 WL 3104869, at *2-*3; *see* R. 10, tr., at 695.  The claimant must satisfy all three of these elements to have a medically determinable impairment of fibromyalgia.  SSR 12-2p, 2012 WL 3104869, at *2; *see. e.g.*, *Piercy v. Commissioner*, No. 5:18CV2214, 2019 WL 6051552, at *9 (N.D. Ohio Nov. 15, 2019) (need all 3 criteria); *Cook v. Commissioner*, No. 3:13CV1114, 2015 WL 1400647, at *12-*13 (N.D. Ohio Mar. 26, 2015) (objective evidence of all 3 criteria).

diagnosis of fibromyalgia corroborate the severity of a claimant's pain symptoms. *See Vance v. Comm'r of Soc. Sec.*, 260 Fed. App'x 801, 806 (6th Cir. 2008) ("A diagnosis of fibromyalgia does not automatically entitle [claimant] Vance to disability benefits; particularly so here, where there is substantial evidence to support the ALJ's determination that [claimant]'s fibromyalgia was either improving, or, at worst, stable."); *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) ("Some people may have a severe case of fibromyalgia as to be totally disabled from working . . . but most do not and the question is whether [claimant] is one of the minority."); *accord Foutty v. Comm'r of Soc. Sec.*, No. 5:10 CV 551, 2011 WL 2532915, at *7 (N.D. Ohio June 2, 2011) (Knepp, M.J.), *report and recommendation adopted*, 2011 WL 2532397 (N.D. Ohio June 24, 2011).

SSR 12-2p sets forth not only the necessary requirements for a finding that a claimant has fibromyalgia, but also explains the manner to evaluate a person's statements about his or her symptoms and functional limitations (*i.e.* credibility). Essentially, ALJs are instructed to use the same method in determining credibility as set forth in SSR 96-7p. *Id.* First, the ALJ must determine whether "medical signs and findings that show the person has an MDI(s) which could reasonably be expected to produce the pain or other symptoms alleged," recognizing that fibromyalgia "satisfies the first step of our two-step process for evaluating symptoms." *Id.* Second, and more pertinent to the case at bar, SSR 12-2p specifically allows the ALJ to consider whether "*objective medical evidence* … substantiate[s] the person's statements about the intensity, persistence, and functionally limiting effects of symptoms." *Id.* If not, the ALJ is to consider "all of the evidence in the case record, including the person's daily activities, medications or other treatments the person uses, or has used, to alleviate symptoms; the nature

and frequency of the person's attempts to obtain medical treatment for symptoms; and statements by other people about the person's symptoms." *Id.* Therefore, Plaintiff's suggestion that the ALJ erred by considering the lack of objective evidence corroborating the severity of her alleged pain symptoms simply because this case involves fibromyalgia is not well taken.

Moreover, this case is distinguishable from the cases upon which Plaintiff relies.[3]  In *Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815 (6th Cir. 1988) (per curiam), the Sixth Circuit reversed where the ALJ appears to have questioned a claimant's *diagnosis* of fibrositis based on a lack of objective medical evidence.  Here, the ALJ did not question that Plaintiff's fibromyalgia constituted a severe impairment.  Plaintiff, however, has alleged symptoms of an extreme magnitude, testifying that she barely gets off her recliner and sometimes spends days in bed.  (Tr. 767).  She also testified that she can sit for only twenty to thirty minutes before needing to get up.  (Tr. 755).

The claimant's statements as to pain or other symptoms will not alone establish that she is disabled.  *Walters*, 127 F.3d at 531 (citing 20 C.F.R. § 404.1529(a)).  The Sixth Circuit has established a two-part test to evaluate complaints of disabling pain when the pain forms a basis of the claimant's disability claim.  *Rogers*, 486 F.3d at 247; *see also* SSR 16-3p, 2017 WL 5180304, at *3-*4 (Oct. 25, 2017).  First, the ALJ must determine whether there is "an underlying medically determinable physical impairment that could reasonably be expected to produce the claimant's symptoms."  *Id.* (citing 20 C.F.R. § 416.929(a)).  The ALJ here determined that Fox's medically determinable impairments could reasonably be expected to cause the alleged symptoms.  (R. 10, tr., at 699).

---

[3] The court also notes that the cases relied upon by Plaintiff predate SSR 12-2p.

If the first test is satisfied, the ALJ must then evaluate "the intensity, persistence, and limiting effects of the symptoms on the individual's ability to do basic work activities." *Rogers, 486 F.3d at 247*.  Social Security Ruling 16-3p lists the factors relevant to the ALJ's determination at this step, which include: the individual's daily activities; the location, duration, frequency and intensity of the individual's pain or other symptoms; the type, dosage, effectiveness and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; treatment, other than medication, the individual has received for relief of pain or other symptoms; any measures other than treatment the individual uses or has used to relieve pain, and, "[a]ny other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms." SSR 16-3p, 2017 WL 5180304, at *7-*8; *see also Felisky v. Bowen, 35 F.3d 1027, 1038 (6th Cir. 1994)* (citing 20 C.F.R. § 1529(a), (c)).  An ALJ is not required to expressly address all the factors listed in SSR 16-3p, but should sufficiently articulate her assessment of the evidence to assure the court that she considered all relevant evidence. *Cross v. Commissioner, 373 F. Supp.2d 724, 733 (N.D. Ohio 2005)*.

When a claimant's complaints regarding symptoms, or their intensity and persistence, are not supported by objective medical evidence, the ALJ must make a determination of the credibility of the claimant's allegations of pain "based on a consideration of the entire case record." *Rogers, 486 F.3d at 247*; *see also Luukkonen, 2016 WL 3426370, at *5*.  To the extent that the ALJ's findings are based on the credibility of the claimant, those findings are accorded great weight and deference. *Walters, 127 F.3d at 531*; *Gonzalez v. Commissioner, No. 1:06CV687, 2008 WL 584927, at *5 (W.D. Mich. Jan. 17, 2008)*.  The ALJ's credibility

17

determinations must be "based on a consideration of the entire case record," and "must find support in the record." *Rogers*, 486 F.3d at 247-248.

The ALJ here determined that, although claimant's severe impairments could reasonably be expected to cause her symptoms, the statements concerning the intensity, persistence and limiting effects of those symptoms were not entirely consistent with the medical evidence and other evidence of record.  (R. 10, tr., at 699).  The ALJ acknowledged that Fox had a longstanding history of fibromyalgia and had reported pain in her back, hips, legs, shoulders, and neck for many years.  *Id.*  She noted that physical exams showed that palpitation resulted in numerous painful areas, with localized spasms.  *Id.*  The ALJ discussed the claimant's consistent complaints of fibromyalgia pain and migraine headaches, along with other complaints such as fatigue, hip and pelvic pain, general weakness, joint pain and swelling, sleep difficulties, and numbness in her fingers.  *Id.*

The ALJ further discussed many of the claimant's individual symptoms and considered most of the SSR 16-3p factors.  (R. 10, tr., at 699-701).  For example, the ALJ noted that Fox had seen a neurologist, and had an EMG to address symptoms of numbness in her hands and arms, but all tests showed normal results.  *Id.* at 699.  While Fox reported in 2016 that she continued to have intermittent numbness in both hands, it usually resolved on its own.  *Id.*  More recently, Fox testified that the condition had worsened, her fingers were numb, and she dropped things.  *Id.* The ALJ indicated that the medical record as of the date last insured did not support these allegations of worsened loss of sensation and numbness.  *Id.*  The ALJ also noted that Fox complained of fatigue, muscle weakness and tenderness, with joint pain and swelling, at a March 2016 evaluation by rheumatologist.  (R. 10, tr., at 699).  The tests and studies, as the ALJ's

18

decision noted, were normal, and Fox was referred back to her pain management doctor for continued treatment.  *Id.*

Moreover, the ALJ stated that Fox had consistently complained of migraine headaches, for which she received treatment, along with fibromyalgia, from a pain management physician. (R. 10, tr., at 700).  The ALJ noted that her migraines had decreased with adjustment of pain medications, along with physical therapy.  *Id.*  In 2013, for example, neurologist Dr. Hagen determined that over-medication was exacerbating her headaches.  *Id.*  When the medications were modified, Fox noted improvement in the number of headaches she was having—by August 2013, she was "really doing quite well with her headaches," and by June 2014, Fox reported having only one or two headaches a month.  *Id.* at 700.

Having reviewed the medical evidence of claimant's symptoms, the ALJ determined that overall "the claimant's pain appeared to be well controlled with the prescribed medications," and flare-ups were treated with trigger point injections or temporary increases of medication dosage. (R. 10, tr., at 701).  The ALJ acknowledged "it is not uncommon to find a lack of objective etiology for the reported pain and symptoms associated with fibromyalgia," but she stated that those associated symptoms may cause limitations for an individual.  *Id.*  Here, the physical examinations throughout the record "almost always show full strength, no atrophy and a normal gait."  *Id.*  The ALJ continued:

> The record shows that all physical examinations throughout the record almost always show full strength, no atrophy and a normal gait.  Given the alleged severe pain and reports of her inability to perform many activities, one may expect to find positive observations. The lack of findings in these areas is an indication of ongoing functioning despite the symptoms.  As such, the claimant's symptoms, including the pain, may not be so debilitating as to preclude the performance of all basic work tasks.

*** 

> While the undersigned does not doubt that the claimant experiences pain and
> symptoms of her impairments that limit her abilities. However, the undersigned
> does not find that such limitations are so severe as to preclude all basic work
> activities. The claimant's complaints have been consistent throughout the relevant
> period, but she is said to do well with her treatment. In addition, while there are
> no positive objective clinical findings, physical examinations also show full
> muscle strength and tone with no atrophy and a normal gait. As discussed above,
> fibromyalgia often shows a lack of objective findings, however, the symptoms
> one experiences causes restrictions that, if severe, would likely be observed.
> However, with the noted findings in the record, there are no observed significant
> restrictions as noted by the full muscle strength and tone with no atrophy findings.

*Id.* at 701-702. Thus, the ALJ explained that Plaintiff's lack of muscle atrophy, full muscle strength, and normal gait undermined the alleged severity of her symptoms—a reasonable determination under the circumstances.  The ALJ did not dismiss a diagnosis of fibromyalgia due to the lack of any objective medical test confirming its presence.  The ALJ also did not expect the objective evidence to confirm the presence or severity of Plaintiff's alleged levels of pain.  Instead, given the extremely restricted nature of Plaintiff's alleged activities, or more accurately the lack thereof, it was not unreasonable for the ALJ to expect that such an individual's prolonged inactivity would manifest itself in an observable deterioration of muscle strength, mobility, or other observable clinical signs.  In other words, the ALJ expected to see objective signs of Plaintiff's inactivity rather than of fibromyalgia or its associated symptoms.  Acknowledging those limitations resulting from claimant's symptoms that the ALJ determined were supported by the record, the ALJ included them in the RFC assessment. *Id.*

20

The court finds that the ALJ's assessment of claimant's pain and credibility is supported by substantial evidence in the record.  The decision concerning the extent and impact of the limitations resulting from claimant's symptoms, including fibromyalgia, is supported by substantial evidence and a reasonable application of the SSR 12-2p.  Therefore, the court finds Plaintiff's first  assignment of error to be without merit.

### B.  Functional Capacity Evaluation

Fox contends that the ALJ improperly rejects the results of the functional capacity evaluation (FCE).  (R. 12, PageID #: 1326, 1332).  The FCE was performed by therapist Deborah King on June 18, 2014.  (R. 10, tr., at 547-549).  The ALJ addressed therapist King's FCE as follows:

> Ms. King concluded that the claimant's performance indicated she was "well below a functional level of sedentary work" (Ex 16F:4).  Ms. King stated that the claimant demonstrated the ability to lift a maximum of five pounds at waist height and recommended a frequent load limitation of less than two pounds (*Id*).  Ms. King's report stated that the claimant showed the ability to occasionally bend forward, reach overhead, stair climb, squat, kneel and walk.  She was noted as able to sit for up to 20 minutes at a time and stand for 20 minutes.  The claimant was evaluated regarding her ability to grasp and manipulate objects as well.  Ms. King reported that muscle testing revealed 3/5 bilaterally, that the claimant was in the 25th percentile for heavy grasp and that the claimant was in the 75th percentile for simple grasp (Ex 16F:3).

> The undersigned assigns little weight to Ms. King's opinion as it is not consistent with the overall weight of the record, particularly notes from the claimant's treating sources.  Throughout the treating record, the claimant reports higher pain than she typically reported to her physician.  Furthermore, the treating record repeatedly notes full strength of all extremities, normal muscle tone with no atrophy and a normal gait.  These findings are not consistent with Ms. King's one-time evaluation observations.  In addition, treatment notes show that the claimant has significant relief with her medication (Ex 30F).  For these reasons, the opinion set forth by Ms. King is assigned little weight.  The undersigned further notes that Ms. King is not an acceptable medical source and the opinion has not been signed

or adopted by an approved source.  While there is a mention of a functional capacity evaluation in Dr. Pellegrino's treatment notes, there is no direct correlation and not enough to infer adoption of the evaluation.

(R. 10, tr., at 701-702).

An occupational therapist is not an "acceptable medical source" within the meaning of the social security regulations.  *See, e.g., LaRiccia v. Commissioner*, 549 Fed. Appx. 377, 385 (6th Cir. 2013); *Hash v. Commissioner*, 309 Fed. Appx 981, 987 (6th Cir. 2009); *King v. Saul*, No. 5:18CV1283, 2020 WL 1025170, at *9 (N.D. Ohio Mar. 3, 2020) (citing cases).  Because an occupational therapist is not an acceptable medical source under the regulations, King cannot provide a medical opinion[4] and the ALJ was not required to give any special deference to the occupational therapist's evaluation.  *See generally Kilburn v. Commissioner*, No. 1:17CV603, 2018 WL 4693951, at *11 (S.D. Ohio Sept. 29, 2018) (citing *Nierzwick v. Commissioner*, 7 Fed. Appx.  358, 363 (6th Cir. 2001)); *Turner v. Colvin*, 2015 WL 5474081, at *5 (E.D. Ky. Sept. 16, 2015).

Nevertheless, while information from "other sources" such as an occupational therapist cannot establish the existence of an impairment, "the information may provide insight into the severity of the impairment," and how it affects the individual's ability to function.  SSR 06-3p, 2006 WL 2329939, at *2; *Cruse v. Commissioner*, 502 F.3d 532, 541 (6th Cir. 2007); *King*, 2020

---

[4] The relevant regulation provides:

Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions.

20 C.F.R. § 404.1527(a)(1).

WL 1025170, at *9; *Reynolds v. Colvin*, No. 1:12CV2994, 2013 WL 5316578, at *7 (N.D. Ohio

Sept. 23, 2013). Opinions from "other sources" who have seen the claimant in a professional

capacity should be evaluated by considering how long the source has known the claimant, how

consistent the source's opinion is with other evidence, and how well the source's opinion is

explained. *Cruse*, 502 F.3d at 541; *King*, 2020 WL 1025170, at *9. The regulations provide that

the ALJ should explain the weight given to the other source's opinion. 20 C.F.R.

§ 404.1527(e)(2); *Cruse*, 502 F.3d at 541.

The court finds that the ALJ satisfactorily explained the weight given to King's

evaluation. The ALJ noted that the evaluation was based on a single visit, and that the

evaluation was inconsistent with the other medical evidence of record, particularly treatment

notes from her treating sources. (R. 10, tr., at 701-702). The weight given to King's FCE is

supported by substantial evidence.

<u>C. RFC Assessment</u>

The third assignment of error relates to the ALJ's assessment of Fox's residual functional

capacity (RFC). (R. 12, PageID #: 1317, 1326, 1333). Fox initially frames this issue by alleging

that an ALJ's decision is not supported by substantial evidence "when she adopts a hypothetical

question that is not reflective of plaintiff's RFC." (R. 12, PageID #: 1317, 1326). She, however,

does not address (or even identify) the hypothetical question which would be at issue. *See*

*generally id.* at 1333.

The claimant's RFC is what the claimant can still do despite her limitations. *Bowman v.*

*Commissioner*, 683 Fed. Appx 367, 371 (6th Cir. 2017); 20 C.F.R. § 404.1545(a)(1). The ALJ

has the responsibility for reviewing all the evidence in making this determination, and evaluates

23

every medical opinion received in evidence.  20 C.F.R. §§ 404.1527(c), (e)(2).  Although the ALJ reviews and considers all the evidence before her, the responsibility for assessing the claimant's RFC rests with the ALJ.  20 C.F.R. § 404.1546(c).  This decision is an administrative, not a medical, determination.  *Lumpkin v. Colvin*, 112 F. Supp. 3d 1169, 1172 (D. Colo. 2015).  "The ALJ is not bound to accept the opinion or theory of any medical expert, but may weigh the evidence and draw his own inferences."  *Simpson v. Commissioner*, No. 08-3651, 2009 WL 2628355, at *12 (6th Cir. Aug. 27, 2009); *see also Lumpkin*, 112 F. Supp. 3d at 1172.

Fox contends that the record shows consistent complaints of severe and frequent headaches, which she argues is not accounted for in the RFC.  (R. 12, PageID #: 1333).  She highlights her testimony that she has severe migraines two to three times per month, and then states that the VE testified that a worker who leaves early, is tardy or misses work altogether more than once a month is not employable.  *Id.*  What Fox lacks, however, is evidentiary support providing some connection between her two to three monthly migraines, a resulting limitation, and missing work.  As discussed earlier, the ALJ determined that claimant's migraine headaches had decreased with adjustment of her pain medications, along with physical therapy; subsequently she was "really doing quite well," and by June 2014, Fox reported having only one or two headaches a month.  (R. 10, tr., at 700; *see generally id.* at 364, 505, 511, 528, 543, 1141, 1145).  Fox does not point to any evidence of record establishing a limitation on her ability to work due to migraines.  *See generally* R. 12, PageID #: 1333.  Consequently, Fox has not demonstrated that the ALJ's RFC lacks substantial evidence.

24

VIII.  CONCLUSION

The record evidence as discussed in the ALJ's decision is such that a reasonable mind might accept it as adequate support for the Commissioner's final benefits determination.  The court finds that the ALJ's RFC is supported by substantial evidence; and, therefore, recommends that the Commissioner's final decision be affirmed for the reasons set forth above.

s/ David A. Ruiz
David A. Ruiz
United States Magistrate Judge


Date:  July 8, 2020

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days of service of this notice.  Fed. R. Civ. P. 72(a); LR 72.3(a). Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *see also United States v. Walter*s, 638 F.2d 947 (6th Cir. 1981).